AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Kansas

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>the Premises and Devices located at<br>210 E MAIN STREET, ALDEN, KANSAS<br>as further described in Attachment A | )<br>)<br>)  Case No.  23-M-6018 -01-KGG<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
the Premises and Devices located at 210 E MAIN STREET, ALDEN, KANSAS, as further described in Attachment A

located in the _____ District of _____ Kansas _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☐ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2252/2252A | Possession/Receipt/Distribution of Child Pornography |

The application is based on these facts:

See Attached Affidavit of Probable Cause.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Kasev R. Sundar, SA, FBI
*Printed name and title*

Sworn to before me and signed telephonically.

Date:  **Jan 24, 2023**

*Judge's signature*

City and state:  Wichita, KS

The Honorable Kenneth G. Gale, US Magistrate Judge
*Printed name and title*

| Print | Save As... | Attach | Reset |
|---|---|---|---|

UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>**THE PREMISES AND DEVICES LOCATED AT**<br><br>**210 E MAIN STREET, ALDEN, KS**<br><br>**AS FURTHER DESCRIBED IN ATTACHMENT A** | **Case No. 23-M-6018 -01-KGG** |

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Kasev R. Sundar am a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

### INTRODUCTION

1. I have been employed as a Special Agent (SA) with the FBI since January 8, 2021. I am currently assigned to the FBI Wichita Resident Agency (RA). While employed by the FBI, I have investigated federal criminal violations related to child exploitation and child pornography. I have gained experience through training at the Heart of America Regional Computer Forensics Laboratory in Kansas City, MO and everyday work relating to conducting these types of investigations. I have received training in the area of child pornography and child exploitation, and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media. At the Heart of America Regional Computer Forensics Laboratory, I received training and certifications in using the Cellebrite software to extract

and analyze data from electronic media devices. I have also completed training, provided by the FBI and the National Criminal Justice Training Center, on conducting Freenet investigations. Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2252 and 2252A, and I am authorized by law to request a search warrant.

2. As a Special Agent of the FBI, I am authorized to investigate violations of laws of the United States, and I am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States, including violations of Title 18 U.S.C. §§ 2252 and 2252A. Before becoming a Special Agent for the FBI, I was an Army Officer on Active Duty. One of my additional duties during my Active Duty time was conducting non-judicial military investigations into actions that violated military policies such as negligent discharges of firearms, vehicle safety violations, and workplace accidents resulting in injuries.

3. I have received training on conducting a wide variety of criminal investigations, to include organized crime, drug trafficking, human trafficking, crimes against children, major theft, and other federal crimes. I have also received training on the preparation and execution of search warrants. I am currently conducting criminal investigations on multiple subjects.

4. As will be shown below, there is probable cause to believe that the identified residence will contain evidence of the receipt and/or possession of obscene visual representations of the sexual abuse of children, in violation of 18 U.S.C. §§ 2252 and 2252A(a)(1). I submit this application and affidavit in support of a search warrant authorizing the search of the residence described in Attachment A. I seek authorization to seize and examine evidence,

fruits, and instrumentalities of the foregoing criminal violations, which relate to the aforementioned criminal violations, and as further described in Attachment B.

5. This Affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for the location specifically described in Attachment A of this Affidavit, including the entire property located at **210 E Main Street, Alden, KS 67512** (the "SUBJECT PREMISES") and the content of electronic storage devices located therein, for contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252 and 2252A, which items are more specifically described in Attachment B of this Affidavit.

6. The statements in this Affidavit are based in part on information provided by other FBI Agents and Task Force Officers (TFO) and on my investigation of this matter. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252(a)(2) and (b)(1) (distribution and/or receipt of a visual depiction of a minor engaged in sexually explicit conduct); 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2) (possession of and access with intent to view a visual depiction of a minor engaged in sexually explicit conduct); 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1) (distribution and/or receipt of child pornography); and 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) (possession of and access with intent to view child pornography), are presently located at the SUBJECT PREMISES.

## DEFINITIONS

7. The following definitions apply to this Affidavit and Attachment B:

a. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

b. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

c. "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices. See 18 U.S.C. § 1030(e)(1).

d. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

e. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

f. "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet. IP addresses can be "dynamic," meaning that the internet service provider (ISP) assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

g. "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

h. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

i.  "Records," "documents," and "materials," as used herein, include all information recorded in any form and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

j.  "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or 66 simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.

k.  "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## Probable Cause

8.  In August and September 2022, FBI Task Force Officer (TFO) Kenneth Bilderback was undertaking an undercover investigation into peer-to-peer file-sharing via the BitTorrent and eMule[1] networks. As part of his investigation, he observed a computer at IP address 71.34.223.236 that offered and made available multiple videos of child pornography via these two peer-to-peer networks. Notably, the username observed for the eMule client was "Jimbo," which reflected a user-created identifier.

9.  TFO Bilderback conduct a single-source download of a sample of videos that had been offered by, or available from, the computer using the IP address 71.34.223.236. These included:

---

[1] BitTorrent and eMule are publicly available peer-to-peer file-sharing network technologies. By downloading the program, a user is able to connect their computer to the file-sharing network. Computers that are part of that network are referred to as "peers" or "clients." Peers can download files or parts of files from other users while simultaneously providing files or parts of files to others on the network, thereby increasing downloading speed for all of the peers on the network. The BitTorrent network can be accessed through many different client software programs, including the BitTorrent client program, the uTorrent client program, the BitComet client program, and others, all of which are widely available for free on the Internet. Likewise, eMule can be accessed via the eMule client as well as Shareaza. However, the two peer-to-peer networks are distinct.

a. A file titled "AD70AB410FD2918B98A67731EBAB5283.avi" which depicts what appears to be a prepubescent female engaged in oral sex and masturbation with a pubescent male. The female appears to be prepubescent due to the lack of developed breasts, no pubic hair, and small body size compared to the male. This file had been available via eMule on September 4, 2022 between 10:13:10 a.m. Central Standard Time (CST) and 12:24:18 p.m. CST.

b. A file titled "018AF3FCFBE8542BAA056DB417FB1EFE.avi" which depicts what appears to be a prepubescent female pull down her clothing to expose her genital area and then inserting an object into her genital area. This file had been available via eMule on August 17, 2022 between 07:39:22 a.m. CST and 07:47:27 a.m. CST.

c. A file titled "(Children-Sf-1Man) Pthc – Kylie Freeman Aka Vicky (11Yo) – Vicky Beginning And Swallows – [00.14.47].mpg" which depicts a pre-pubescent or tween-aged female who is made to perform oral sex on a male and is subjected to penetrative sex acts. Notably, the title of the file bears the name of a widely distributed known child pornography series, e.g., the Vicky series, and appears to be part of that series. This file had been available via BitTorrent on August 31, 2022 between 10:02:09 a.m. CST and 12:43:58 p.m. CST.

d. A file titled "8D62458D068D3FECFDB140BFA307C4D3.avi" which depicts the same female in the preceding video (in paragraph 12c) who is subjected to anal/vaginal penetrative sex acts by an adult male. As in the other video, the female appears to be pre-pubescent or at the onset of puberty due to having slightly developed breasts, no pubic hair, and a small body frame. This file had been available via eMule on September 2, 2022 between 01:32:30 a.m. CST and 03:55:24 a.m. CST.

10. Notably, though the four files were offered via two different peer-to-peer clients (eMule and BitTorrent), the files were available from the same IP address at the **SUBJECT PREMISES**.

11. TFO Bilderback identified the service provider for the observed IP address as Lumen Technologies DBA Century Link and issued a subpoena for subscriber information. The subscriber for the IP address at the time of the downloads was identified as Emma German at 210 E Main Street, Alden, KS 67512 (**SUBJECT PREMISES**).

12. Contact with the Rice County Sheriff's Office revealed Emma German lived at the **SUBJECT PREMISES** with her husband Gary and an adult (nearly 60 year old) son named James Dean Yohn.

13. Subsequent investigation into Yohn revealed he had been convicted of Indecent Liberties with a Child (KSA 21-3503) in the Reno County District Court on January 13, 1994.

14. On December 1, 2022, your affiant conducted surveillance at the **SUBJECT PREMISES** with Rice County Sheriff personnel. The residence included a single-family residence, a mobile-home, five sheds, a car-port, three recreational vehicles (RVs), a Toyota Highlander and a Ford F-150. Some of the license plates were visible, including: RV bearing Kansas license plate 713HHZ; an RV bearing Kansas license plate 931EBB, and the Highlander bearing Kansas license plate 610LFJ. We were unable to observe the license plates for the third RV or the Ford F-150 on the property.

15. Rice County Sheriff Deputy John Poe informed me that he had recently responded to a 911 call at **SUBJECT PREMISES** involving Yohn, and he observed Yohn entering the RV with Kansas license plate number 713HHZ with a dog that might have been a Rottweiler or a pit bull. Based on this observed, he believed James Dean Yohn resided primarily inside the RV with Kansas license plate number 713HHZ.

16. License plate checks, via the Kansas Criminal Information Justice System, revealed:

   a. the Toyota Highlander with Kansas tag number 610LFJ is registered to Emma German and Gary German, the owners of the property, and the registration is active.

   b. the RV with Kansas tag number 713HHZ showed the registration was expired, but had belonged on a Pace RV with the registered owner identified as Ari Hooley.

   c. the RV with Kansas tag number 931EBB showed the registration was expired, but has belonged on a Winnebago RV with the registered owners identified as Emma German and Gary German.

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

17. I have had both training and experience in the investigation of computer-related crimes.

   Based on my training, experience, and knowledge, I know the following:

a. Computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. There were definable costs involved with the production of pornographic images. To distribute these on any scale required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these photographs was accomplished through a combination of personal contacts, mailings and telephone calls. The development of computers has changed this. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage. Child pornographers can now transfer photographs from a camera onto a computer-readable format with a device known as a scanner. With the advent of digital cameras, the images can now be transferred directly onto a computer. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

b. Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world. Child pornography can therefore be easily, inexpensively and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

d. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types – to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer – can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

e. The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f. Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide e-mail services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone or external media in most cases.

g. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*i.e.*, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files). Digital information can also be retained unintentionally such as the traces of the path of an electronic communication may be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

h. A popular technology for child pornographers is peer to peer file sharing (P2P). P2P file sharing is a method of communication available to Internet users through the use of special software. Computers linked together through the Internet using this software form a network that allows for the sharing of digital files between users on the network. A user first obtains the P2P software, which can be downloaded from the internet. In general, P2P software allows the user to set up file(s) on a computer to be shared with others running compatible P2P software. A user obtains files by opening the P2P software on the user's computer and conducting a search for files that are currently being shared on the network. Examples of P2P software that are used by child pornographers today include Freenet, BitTorrent, Gnutella, Gnutella2, and eMule.

i. For example, a person interested in obtaining child pornographic images would open the P2P application on his/her computer and conduct a search for files using a term such as "preteen sex" or "PTHC[2]" or even an age range, such as "1yo-12yo." The search is sent out over the network of computers using compatible P2P software. The results of the search are returned to the user's computer and displayed. The user selects from the results displayed the file(s) he/she wants to download. The file is downloaded directly from the computer hosting the file. The downloaded file is stored in the area previously designated by the user. The downloaded file will remain there until moved or deleted.

j. One of the advantages of P2P file sharing is that multiple files may be downloaded in parallel. This means the user can download more than one file at a time. In addition, a user may download parts of one file from more than one source computer at a time. For example, an eMule user downloading an image file may actually receive parts of the image from multiple computers. The advantage of this is that it speeds up the time it takes to

---

[2] An acronym for Preteen Hardcore.

download the file. Often, however, an eMule user downloading an image file receives the entire image from one computer. eMule sets up its searches by keyword. The results of the keyword search are displayed to the user. The user then selects file(s) from the results for download. The download of a file is achieved through a direct connection between the computer requesting the file and the computer containing the file.

k. BitTorrent allows users to join a "swarm" of hosts to upload and download from each other simultaneously. The file being distributed is divided into segments called pieces. As each peer receives a new piece of the file, it becomes a source of that piece for other peers, relieving the original seed from having to send that piece to every computer or user wishing a copy. The distributed nature of BitTorrent can lead to a flood-like spreading of a file throughout many peer computer nodes. As more peers join the swarm, the likelihood of a successful download by any particular node increases.

l. A P2P file transfer is assisted by reference to an Internet Protocol (IP) address. This address, expressed as four sets of numbers separated by decimal points, is unique to a particular computer during an online session. The IP address provides a unique location making it possible for data to be transferred between computers.

m. Third party software is available to identify the IP address of the P2P computer sending the file and to identify if parts of the file came from one or more IP addresses. Such software monitors and logs Internet and local network traffic.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

18. As described above and in Attachment B, this application seeks permission to search for records that might be found at the **SUBJECT PREMISES** in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

19. I submit that if a computer or storage medium is found at the **SUBJECT PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files

downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

20. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium at the **SUBJECT PREMISES** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, pieces, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

    f.   I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

21. Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I also know that during the search of the **SUBJECT PREMISES** it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

    a.   Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software website, or operating system that is being searched;

    b.   Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law

enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the **SUBJECT PREMISES**; and

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file, which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

22. Additionally, based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of so-called "wireless routers," which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator

used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

23. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## SEARCH METHODOLOGY TO BE EMPLOYED

24. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

   a. examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

   b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

   c. surveying various file directories and the individual files they contain;

   d. opening files in order to determine their contents;

   e. scanning storage areas;

f.  performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and/or

g.  performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO POSSESS AND/OR

## ACCESS WITH INTENT TO VIEW CHILD PORNOGRAPHY

25. The majority of individuals who collect child pornography are persons who have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

a.  The majority of individuals who collect child pornography collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. The majority of these individuals also collect child erotica, which may consist of images or text that do not rise to the level of child pornography but which nonetheless fuel their deviant sexual fantasies involving children.

b.  The majority of individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support. This contact also helps these individuals to rationalize and validate their deviant sexual interest and associated behavior. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, P2P, e-mail, e-mail groups, bulletin boards, IRC, newsgroups, instant messaging, and other similar vehicles.

c.  The majority of individuals who collect child pornography maintain books, magazines, newspapers and other writings, in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires. Such individuals rarely destroy these materials because of the psychological support they provide.

d.  The majority of individuals who collect child pornography often collect, read, copy or maintain names, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

e. The majority of individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials. THEY ALMOST ALWAYS MAINTAIN THEIR COLLECTIONS IN THE PRIVACY AND SECURITY OF THEIR HOMES OR OTHER SECURE LOCATION.

f. Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world. Thus, even if the subject of this investigation uses a portable device (such as a mobile phone) to access the internet and child pornography, it is more likely than not that evidence of this access will be found at the **SUBJECT PREMISES**.

26. Based on the following, I believe that an individual residing at **SUBJECT PREMISES** likely displays characteristics common to individuals who possess or access with intent to view child pornography.  For example, the subject of this investigation has downloaded two different peer-to-peer file-sharing clients, to access two different peer-to-peer file-sharing networks, and has made available files containing child pornography (which required first downloading those same files). Likewise, the content of the files demonstrates a consistent interest in a particular type of content, i.e., the sexual penetration and abuse of prepubescent female minors, which has been available over several different dates. Additionally, the title of one of the files would be readily recognizable as child pornography, indicating the user is actively pursuing that material.

## CONCLUSION

27. Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B, are located at the **SUBJECT PREMISES** described in Attachment A.  I respectfully request that this Court issue a search warrant for the locations described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

28. I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the **SUBJECT PREMISES**. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

Kasev R. Sundar
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to me telephonically this **24ᵗʰ** day of January, 2023.

THE HONORABLE KENNETH G. GALE
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF KANSAS

## **ATTACHMENT A**

### **DESCRIPTION OF THE PREMISES TO BE SEARCHED**

The SUBJECT PREMISES is a property that contains a mobile home, a single-family home, three recreational vehicles, five sheds, and a carport. The mobile home and the single-family home are white in color. The mobile home is a single floor home, and the single-family home appears to be a two-story home. One of the recreational vehicles has the license plate 713HHZ, and the manufacturer of the recreational vehicle is Pace per a DMV check. Another recreational vehicle has the license plate 931EBB, and the manufacturer of the recreational vehicle is Winnebago per a DMV check. As mentioned earlier, I was unable to observe a license plate on the third recreational vehicle located on the SUBJECT PREMISES, but I did observe that it was white in color and parked adjacent to the recreational vehicle with the license plate 713HHZ, and both of those vehicles are located on the north side of the property. The recreational vehicle with license plate 931EBB is parked between the single-family home and one of the sheds on the property. Two of the sheds are located just east of the mobile home, one shed is located just north of the mobile home, and two sheds are located north-east side of the mobile home.

 
















**ATTACHMENT B**

**ITEMS TO BE SEIZED**

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. §§ 2252 and 2252A:

1. Computers or storage media used as a means to commit the violations described above.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. Evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. Evidence of the lack of such malicious software;

   d. Evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

e.  Evidence indicating the computer user's knowledge and/or intent as it relates to the crime(s) under investigation;

f.  Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  Evidence of programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  Evidence of the times the COMPUTER was used;

i.  Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  Records of or information about Internet Protocol addresses used by the COMPUTER;

l.  Records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m.  Contextual information necessary to understand the evidence described in this attachment.

3.  Routers, modems, and network equipment used to connect computers to the Internet.

4.  Child pornography and child erotica.

5.  Records, information, and items relating to violations of the statutes described above including:

a.  Records, information, and items relating to the occupancy or ownership of the SUBJECT PREMISES, including utility and telephone bills, mail envelopes, or addressed correspondence;

b.  Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

c.  Records and information relating to the identity or location of the persons suspected of violating the statutes described above;

d.  Records and information relating to the sexual exploitation of children, including correspondence and communications between users of peer-to-peer networks, including those described in the attached affidavit;

e.  Records and information showing access to and/or use of peer-to-peer networks, including those described in the attached affidavit; and

f.  Records and information relating or pertaining to the identity of the person or persons using or associated with the usage of peer-to-peer networks, including those described in the attached affidavit.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions,

including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.